J-S22011-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAESON DOOLEY | : | |
| | : | |
| Appellant | : | No. 883 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 14, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006050-2023

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAESON DOOLEY | : | |
| | : | |
| Appellant | : | No. 884 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 14, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0006049-2023

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAESON DOOLEY | : | |
| | : | |
| Appellant | : | No. 885 EDA 2025 |

Appeal from the Judgment of Sentence Entered March 14, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008010-2023

BEFORE:  PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED AUGUST 13, 2026**

Jaeson Dooley appeals from the judgment of sentence imposed on March 14, 2025, for his convictions of three counts each of unlawful contact with minor, corruption of minors, and indecent assault of a child less than 13 years of age, and one count each of rape of a child and involuntary deviate sexual intercourse with a child.[1] Dooley asserts the trial court erred in its instructions to the jury and in failing to adequately advise him of his post-sentencing rights; he also challenges the discretionary aspects of the sentence imposed, and the weight of the evidence. After careful review, we affirm.

The trial court set forth the relevant factual and procedural history:

This matter arises from allegations of sexual abuse brought by three minor complainants: J.M. (born [in] 2011), K.D. (born [in] 2013), and J.D. (born [in] 2013). [Dooley] is the biological father of K.D. and J.D., and at the time relevant to the allegations, was in a relationship with Lynda Sistrunk …, the mother of J.M. During that time, [Dooley] and Ms. Sistrunk lived together in Philadelphia along with J.M. and Ms. Sistrunk's two other children.

Following a five-day trial where the three matters were consolidated, a jury found [Dooley] guilty of the [above listed] charges.

\* \* \*

On March 14, 2025, [Dooley] received an aggregate sentence of twenty-two (22) to forty-eight (48) years of incarceration with five years of reporting probation and was found to be a sexually violent predator. [The trial court] also ordered [Dooley] to comply with all registration requirements and other rules applicable to a Tier

---

[1] 18 Pa.C.S.A. §§ 6318(a)(1), one count of 6301(a)(1)(i), two counts of 6301(a)(1)(ii), 3126(a)(7), 3121(c), and 3123(b), respectively.

III sex offender and to comply with the individualized sex offender treatment plan as dictated by the treatment provider.

CP-51-CR-0008010-2023—J.M.

J.M., the daughter of [Dooley's] then-girlfriend, disclosed that in February 2023, while [Dooley] was helping her with a Black History Month project in the basement of their home, [Dooley] began rubbing her elbow before reaching under her shirt and touching her chest with both of his hands. She stated that she felt his hands on her skin and froze during the incident.

Although J.M. was initially afraid to tell anyone, she later confided in her sister … via text message, stating that she believed J.D. and K.D.'s allegations of sexual abuse (discussed below) because [Dooley] had also touched her inappropriately and made her feel uncomfortable. She specifically mentioned a time when [Dooley] touched her "nonexistent boobies." J.M. expressed fear that her mother would either not believe her or retaliate against [Dooley] and asked her sister not to tell anyone.

The disclosure came to light when J.M.'s brother's girlfriend found the messages and forwarded them to Ms. Sistrunk, who in turn, contacted the police.

Officer Ravenne Frederick … responded to the report and spoke with J.M. who admitted that [Dooley] had touched her chest. Officer Frederick noted J.M.'s anxious demeanor, which was captured on his body-worn camera. The footage depicted J.M. with fidgety hands, playing with and dropping a toy, and ultimately crying in the hallway after making her disclosure.

J.M was taken to the Special Victims Unit ("SVU")[,] as was required after any sexual assault report. Because she was twelve years old when the assault occurred, J.M. was referred for a forensic interview at Philadelphia Children's Alliance (["]PCA["]).

J.M. underwent a forensic interview at PCA on June 26, 2023, during which she reiterated that [Dooley] had touched her chest underneath her shirt. During that interview, J.M. disclosed that [Dooley] may have been doing certain things to gain her trust, such as buying her sneakers and getting her out of trouble with her mother.

CP-51-CR-0006050-2023—K.D.

K.D. is [Dooley's] biological daughter. In April 2023, while K.D. and J.D. were staying with their paternal grandmother, Darlene Ward …, K.D.'s mother, De'Asiah Williams … discovered that K.D. had searched "sexual abuse" on their shared TikTok account.

When Ms. Williams went to pick up her daughter and J.D. from Ms. Ward's house, she asked K.D. why she had searched the topic of sexual abuse and whether anyone had touched her inappropriately. K.D. initially denied that anything had occurred but eventually broke down and disclosed that [Dooley] had touched her inappropriately.

K.D. stated that "he will make her put his hand inside of her pants to massage [her] leg." K.D. further disclosed that [Dooley] touched her chest and hugged her inappropriately tightly, in a way that caused her to feel his genitals.

K.D. further described an incident where [Dooley] was laying behind her, and she felt his "private part[,"] which was "hard[,"] positioned between her legs and pressing against her butt.

Following K.D.'s disclosure, Ms. Williams contacted J.D.'s mother, Shaqueena Sanders … and advised her to speak with J.D. because K.D. had indicated that J.D. was also being touched inappropriately. Ms. Williams cautioned Ms. Sanders not to reveal that the information had come from K.D.

Ms. Williams subsequently reported the abuse to the police on April 25, 2023. A few weeks later, K.D. was scheduled for a medical examination and a forensic interview.

After K.D. was examined, the doctors informed Ms. Williams that K.D. had been penetrated. K.D. broke down in tears, repeatedly saying "my dad, my dad, my dad." K.D. then disclosed to her mother that [Dooley] had vaginally penetrated her. K.D. described how [Dooley] got on top of her, pulled her pants down while his pants were off, and began "humping her" —specifically inserting his penis in and out of her vagina.

Ms. Williams and Ms. Sistrunk both recalled conversations in which [Dooley] referenced K.D. starting her menstrual cycle. Ms. Williams had received a text message from [Dooley] dated July

23, 2022, informing her that K.D., who was eight years old at the time, had gotten her period. However, this claim was inconsistent with K.D.'s medical history, as she had not yet begun menstruating as of the time of trial in 2024.

During her first forensic interview at PCA on May 31, 2023, K.D. did not disclose all of the incidents because she was afraid that if DHS got involved, she would be taken away from her mother. During a second forensic interview at PCA on August 9, 2023, K.D. fully disclosed the abuse.

CP-51-CR-0006049-2023—J.D.

J.D., also [Dooley's] biological daughter, disclosed that [Dooley] had sexually abused her on multiple occasions when she was between the ages of eight and nine. The abuse occurred at various locations, including Ms. Sistrunk's house, Ms. Ward's house, and her aunt Kim's house.

The first incident occurred in the basement of Ms. Sistrunk's house where J.D. was lying next to [Dooley] while watching a movie. [Dooley] rubbed her back, shoulders, chest, and leg underneath her clothes. [Dooley] then pulled down her pants and licked her vagina. She recalled feeling "sad" and thinking about how strange the experience was. J.D. did not disclose the abuse to Ms. Sistrunk, fearing that Ms. Sistrunk would inform [Dooley], who in turn would become upset and possibly hit her. J.D. further described a second, similar incident that also occurred in the basement of Ms. Sistrunk's house, where [Dooley] rubbed her chest, back, and feet.

In another incident at Ms. Ward's house, J.D. recounted that after her half-sister K.D. fell asleep, [Dooley] rubbed her chest and back over her clothing, then removed her pants, and licked her vagina. She described his body being on top of her and specifically her "down area." J.D. felt anxious throughout the incident and wanted to cry.

A third incident occurred at her Aunt Kim's house where [Dooley] rubbed J.D.'s shoulders and chest while they were alone in her brother's bedroom.

J.D. did not immediately disclose the abuse because she was afraid. The disclosure came to light after Ms. Williams'

conversation with Ms. Sanders. Ms. Sanders spoke with J.D. who confirmed [Dooley] was engaging in inappropriate conduct with her.

Ms. Sanders reported the abuse to the police on April 24, 2023. J.D. was then taken to the police station and underwent a physical examination. J.D. was also referred to PCA due to her young age. On May 8, 2023, J.D. was interviewed at the PCA. During this forensic interview, J.D. explicitly stated that [Dooley], her biological father, had been sexually abusing her since she was eight or nine years old. She detailed that on multiple occasions, [Dooley] touched her chest, back, and shoulders, and licked her vagina.

Trial Court Opinion, 7/3/25, at 1-7 (footnotes and unnecessary capitalization omitted).

Dooley did not file a post-sentence motion. On April 4, 2025, Dooley filed, through counsel, a timely notice of appeal to this Court. On that same date, counsel filed a motion to withdraw as counsel. The trial court granted counsel's request to withdraw and appointed new counsel on April 22, 2025.

The trial court ordered new counsel to file a Rule 1925(b) statement. *See* Pa.R.A.P. 1925(b). Counsel complied and filed Dooley's statement on June 1, 2025. *See id.* The trial court authored its Rule 1925(a) opinion on July 3, 2025. *See* Pa.R.A.P. 1925(a). The trial court found many of Dooley's claims waived for failure to file a post-sentence motion. This Court briefly remanded the case for the trial court to author a supplemental 1925(a) opinion addressing Dooley's weight of the evidence claim. The trial court complied and authored this supplemental opinion on July 20, 2026.

This matter is now ripe for our review. Dooley raises four claims of error:

I. Did the court err when it denied the defense request to instruct the jury on the significance of the failure to make a prompt complaint and where it did not give defense counsel an opportunity on the record to re-request the instruction after the court had completed its charge to the jury?

II. Did the court err where it failed to advise [Dooley] of his right to file post[-]sentence motions where there was no evidence that [Dooley] understood his right, where there was no evidence that trial counsel had explained or discussed [Dooley's] right with him, where counsel failed to file a post[-]sentence motion thereby leaving [Dooley] with the functional equivalent of having no counsel, where the failure to file a post[-]sentence motion caused a waiver of [Dooley's] right to challenge the weight of the evidence, the discretionary aspects of sentencing where there were arguable meritorious non-frivolous grounds for filing a post[-]sentence motion?

III. Doe[s] [Dooley's] sentence present a substantial question that the sentence is inappropriate because it is unduly harsh and excessive and does not conform to the norms and purposes underlying the Sentencing Code?

IV. Were [Dooley's] convictions against the weight of the evidence and credibility of the evidence and shocking to one's sense of justice where there were a significant number of inconsistencies, and where there was compelling evidence of bias, motive to fabricate and undue influence by family members and caregivers of the minor victims?

Appellant's Brief, at 6-7 (unnecessary capitalization and lower court answers omitted).

Dooley first argues the court erred in denying his request to instruct the jury on the victims' failure to disclose the abuse promptly after it occurred, often called the prompt complaint instruction. **See** Appellant's Brief, at 15. Dooley asserts the court did not conduct a thorough inquiry into the victims'

- 7 -

ability to deceive, which, he claims, is the "fundamental question in determining whether the instruction is appropriate[.]" *Id.* at 16.

The Commonwealth submits this claim is waived because Dooley did not object to the instructions given to the jury. *See* Appellee's Brief, at 10. Dooley simply asked for the instruction prior to, but did not object to the actual instructions given, thereby waiving the claim on appeal. *See id.* Alternatively, the Commonwealth contends this claim is meritless, as the court considered the tender ages of the children and the fact that Dooley was their biological father and parental figure (Dooley only requested the prompt complaint instruction as to victims K.D. and J.D.). *See id.* at 12-13; N.T. Trial, 8/22/24, at 85.[2]

The trial court found this issue waived, and without merit. *See* Trial Court Opinion, 7/3/25, at 11-14. The trial court noted that Dooley did not "object to the denial of a prompt complaint instruction" at trial thereby waiving the claim. *Id.* at 11. The trial court explained Dooley had an opportunity after it instructed the jury to object to the instructions and he failed to do so:

> [Dooley] had another opportunity to request the [prompt complaint] jury instruction immediately after [the trial court] charged the jury. It is [the trial court's] practice to ask counsel at sidebar, following the jury charge and before dismissing the jury for deliberations, whether either party has anything further to add. At that time, [Dooley's] counsel failed to preserve the issue

---

[2] We note that the trial transcript this Court received is dated August 18, 2024. However, it is clear this is a typographical error and the proceedings referenced within occurred on August 22, 2024. We therefore will refer to the correct date of the proceedings when citing to this transcript.

and rather, indicated that he had nothing further to add to the jury instructions. …

*Id.* at 12 (citing N.T. Trial, 8/23/24, at 64-65).

The trial court further addressed the claim in the alternative and stated it did not give the prompt complaint instruction because "it was neither legally required nor factually required and the court properly instructed the jury on credibility." *Id.* at 13. The court detailed its decision:

> [The court] considered both the victims' ages and mental capacity to appreciate the nature of the offenses and found the instruction to be inappropriate under the circumstances of this case, because the perpetrator held a position of authority over the victims— specifically, [Dooley] was the biological father of the two victims for whom defense counsel sought the instruction.

*Id.* at 14.

Even if we were to find Dooley adequately preserved the issue for our review, we would find it meritless.

> We review the failure to give a requested jury instruction as follows:

> When considering a trial court's failure to give a requested jury instruction, the relevant inquiry for this Court is whether such charge was warranted by the evidence in the case. Moreover, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case.

> > If we find that the court should have included the instruction, then we must determine whether its omission prejudiced the defendant. If we determine the decision not to give an instruction was an error of law which might have prejudiced the defendant, then we must determine the error was not harmless before granting a new trial.

- 9 -

> Likewise, if the instruction proffered is inapplicable and improper, the court should not charge on it.

***Commonwealth v. Dula***, 262 A.3d 609, 635-36 (Pa. Super. 2021) (citations, brackets, ellipsis, and quotation marks omitted).

Dooley requested a prompt complaint instruction, previously found at Pennsylvania Suggested Standard Criminal Jury Instruction 4.13A,[3] because victims K.D. and J.D. did not disclose the abuse immediately after it occurred. This Court has described the rationale and basis for a prompt complaint instruction as follows:

> The premise for the prompt complaint instruction is that a victim of a sexual assault would reveal at the first available opportunity that an assault occurred. The instruction permits a jury to call into question a complainant's credibility when he or she did not complain at the first available opportunity. However, there is no policy in our jurisprudence that the instruction be given in every case.
>
> The propriety of a prompt complaint instruction is determined on a case-by-case basis pursuant to a subjective standard based upon the age and condition of the victim. For instance, where an assault is of such a nature that the minor victim may not have appreciated the offensive nature of the conduct, the lack of a prompt complaint would not necessarily justify an inference of fabrication.

***Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013) (citations, quotation marks, and brackets omitted).

---

[3] While not applicable here, this instruction was deleted from the Pennsylvania Suggested Standard Criminal Jury Instructions as of September 2024, and the subcommittee has discouraged use of this instruction. Because Dooley's trial was held the month prior, in August 2024, we will not consider its removal in our review.

"Furthermore, in cases where the victim is a child, [the Pennsylvania Supreme Court] commented on the importance of questioning whether the immaturity of the child occasioned the delay as opposed to a design to deceive." *Commonwealth v. Dillon*, 925 A.2d 131, 138 (Pa. 2007) (citation and internal quotation marks omitted). "This is especially true where the perpetrator is one with authority or custodial control over the victim." *Commonwealth v. Thomas*, 904 A.2d 964, 970 (Pa. Super. 2006) (citation omitted). Finally, we note that "in a case such as this, where some evidence favored a prompt complaint instruction and some did not, it fell within the court's discretion to deny this instruction." *Commonwealth v. Williams*, 274 A.3d 722, 737 (Pa. Super. 2022).

As quoted above, the trial court considered the ages of the victims, their mental capacity, and the fact that Dooley was the biological father of both victims, thereby placing him in a position of authority over them. *See* Trial Court Opinion, 7/3/25, at 14. The two victims were between the ages of eight and nine when the abuse occurred. *See* N.T. Trial, 8/20/24, at 100-101, 164; N.T. Trial, 8/21/24, at 70-71. Both victims explained why they did not disclose the abuse sooner. *See* N.T. Trial, 8/20/24, at 51, 60, 166. After our review of the record, we are unable to find any abuse of the court's discretion in declining to provide the prompt complaint instruction. Therefore, even if properly preserved for our review, this issue would not entitle Dooley to relief. We also commend the trial court for addressing this issue on the merits.

Next, Dooley asserts that the trial court erred in advising Dooley of his post-sentencing rights. *See* Appellant's Brief, at 18-20. Dooley asks this Court to find that the next two issues, challenging the discretionary aspects of the sentence and weight of the evidence, are not waived because the only reason he did not file a post-sentence motion was the erroneous advice the court gave him. *See id.* at 19-20.

Rule 704(C)(3) provides the sentencing judge must determine that a defendant has been advised of certain post-sentencing rights. *See* Pa.R.Crim.P. 706(C)(3). The court is required to determine whether the defendant has been advised of those rights "to promote prompt and fair sentencing procedures … by requiring that the defendant be fully informed of his or her post-sentence rights and the procedural requirements which must be met to preserve those rights." Pa.R.Crim.P. 706 comments.

Unfortunately, it is not clear from the record whether Dooley was provided his full post-sentencing rights. Therefore, out of an abundance of caution, we will not find his final two claims waived.

Therefore, we turn to Dooley's next argument, i.e., whether the trial court abused its discretion in imposing its sentence. *See* Appellant's Brief, at 21. Dooley believes the trial court failed to consider his rehabilitative needs, thereby imposing an unduly harsh and excessive sentence. *See* Appellant's Brief, at 21.

> Where [pre-sentence investigation ("PSI")] reports exist, we shall continue to presume that the sentencing judge was aware of

relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.

> A PSI report constitutes the record and speaks for itself. In order to dispel any lingering doubt as to our intention of engaging in an effort of legal purification, we state clearly that sentencing courts are under no compulsion to employ checklists or any extended or systematic definitions of their punishment procedure. Having been fully informed by the [PSI] report, the sentencing court's discretion should not be disturbed. This is particularly true, we repeat, in those circumstances where it can be demonstrated that the judge had any degree of awareness of the sentencing considerations, and there we will presume also that the weighing process took place in a meaningful fashion.

*Commonwealth v. Watson*, 228 A.3d 928, 936 (Pa. Super. 2020) (quotation marks, brackets, and citations omitted).

Here, the trial court had the benefit of a PSI report and mental health investigation prior to imposing sentencing. *See* N.T. Sentencing, 3/14/25, at 4. Just prior to imposing the sentence, the court stated:

> I've taken into consideration the gravity of the offense, the need to provide protection for the community. I've taken into consideration the guidelines in this case. I have also taken into consideration the PSI, the mental health report, the sexual offender assessment, the sentencing memo submitted by the Commonwealth, the addendum to the SOAB report that was submitted by Mr. Pflugfelder. I have also taken into consideration the comments of the victims—or their mothers today. I have also taken into consideration the comments of the Commonwealth, your attorney's comments. I have also taken into consideration that you do have family support and there were people here for you during the course of the trial and here for you today.

*Id.* at 38.

The certified record does not support Dooley's contention that the trial court failed to consider his rehabilitative needs. The court had the benefit of a PSI report and we therefore presume it considered the relevant mitigating factors. **See Watson**, 228 A.3d at 936. The trial court specifically referred to the reports it considered prior to imposing sentence. Therefore, this issue does not merit relief.

Finally, Dooley submits the verdicts are against the weight of the evidence. **See** Appellant's Brief, at 21. Dooley argues:

> In the case at bar, [Dooley's] convictions are shocking to one's sense of justice. There is evidence of prolonged discussions with the 3 children by their significant adults prior to formally making the police complaints against [Dooley]. There is evidence that one child had been searching up terms while unsupervised on a TikTok account. There is evidence that an explicit video was made by the children. There are failures to promptly complain about alleged sexual assaults. There is no evidence that the children lacked the sophistication, the ability or the capacity to deceive and to engage in deception after being caught by the adults in their life engaging in provocative acts. All of the aforesaid circumstances lead to the conclusion that this verdict shocks one's sense of justice.

**Id.** at 22.

> Our scope and standard of review are well settled:
>
> When reviewing a challenge to the weight of the evidence, we review the trial court's exercise of discretion. A trial court may sustain a weight challenge only if the verdict is so contrary to the evidence as to shock one's sense of justice. The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. We defer to the trial court's decision regarding a weight of the evidence claim because it had the opportunity to hear and see the evidence presented.

**Commonwealth v. Garcia Arce**, 352 A.3d 495, 508 (Pa. Super. 2026).

The trial court addressed Dooley's weight claim as follows:

[Dooley's final] issue rests on three related contentions: that the minor complainants' accounts contained a significant number of inconsistent statements; that there was compelling evidence of bias and motive to fabricate; and that the complainants were subject to undue influence by family members and caregivers. Each contention was squarely before the jury at trial, and none is sufficient to shock the conscience of this court.

**A. [Dooley's] claims of inconsistent statements do not render the verdict against the weight of the evidence.**

It is common for witnesses—and especially child witnesses recounting traumatic experiences—to be inconsistent, and not every inconsistency amounts to a contradiction. …

The discrepancies [Dooley] identifies were minor and peripheral to the core of each complainant's account, and each was fully explored before the jury on cross-examination. For example, on cross-examination J.D. was confronted with an apparent inconsistency between her trial testimony and a prior statement regarding whether [Dooley] removed her clothing before or after he left the room to pick up a relative. J.D. promptly clarified that her clothing was not removed until after [Dooley] returned. The jury heard this exchange directly and was free to credit J.D.'s clarification. Similarly, while the three complainants' accounts of certain collateral details—such as the precise sequence of events on a given evening, or who else was in the house at a given moment—were not perfectly aligned, each child consistently and repeatedly described, across multiple disclosures made over the course of more than a year, a pattern of sexual abuse committed by [Dooley]. Discrepancies of this kind, particularly among child witnesses describing repeated abuse occurring over an extended period, are unsurprising and do not render the jury's credibility determinations unreasonable.

Moreover, the core of each complainant's account was substantially corroborated by evidence independent of the complainants' own testimony. [Dooley's] own text message to K.D.'s mother, sent in July 2022, referencing K.D. having started her menstrual cycle—a claim inconsistent with K.D.'s actual medical history but consistent with K.D.'s account that [Dooley] left her bleeding after the assault—corroborated the timeframe

and nature of the abuse K.D. described. J.M.'s anxious and tearful demeanor, including fidgeting and crying in the hallway, was captured contemporaneously on the responding officer's, Officer Frederick's, body-worn camera minutes after her disclosure, before any caregiver had the opportunity to influence her account. Given this corroborating evidence, the jury's decision to credit the complainants' accounts over [Dooley's] characterization of their testimony as irreconcilably inconsistent does not shock the conscience of this court.

**B. [Dooley's] claims of bias, motive to fabricate, and undue influence do not render the verdict against the weight of the evidence.**

At trial, [Dooley] advanced the theory that the complainants fabricated their allegations to avoid discipline arising from an unrelated video, or, in the alternative, that their accounts were the product of pressure and suggestion by their mothers and other caregivers. This theory was fully presented to the jury through [Dooley's] opening statement, cross-examination of the Commonwealth's witnesses, and closing argument. …

The record does not support [Dooley's] characterization of the jury's verdict as shocking to the conscience. J.M. lived in a different household from K.D. and J.D. and had no connection to the video incident that [Dooley] contends supplied the family's motive to fabricate. In fact, J.M. was not present when the video was made and was not part of the household in which it occurred. J.M. disclosed that [Dooley] had touched her inappropriately in a text message to her older sister, describing her own experience. [Dooley's] theory that the complainants fabricated their allegations as a group to avoid punishment for the video does not account for J.M.'s independent disclosure, which arose from circumstances entirely unconnected to the video incident.

As to the claim of undue influence, the record reflects that K.D's mother questioned K.D. in the car with open-ended, non-suggestive questions—asking generally what was going on and whether anyone had touched her inappropriately—rather than leading questions, and that K.D. initially denied that anything had happened before ultimately disclosing the abuse. An initial denial followed by a spontaneous disclosure is difficult to reconcile with a theory of coaching or suggestion. The record further reflects that when K.D.'s mother asked J.D.'s mother to speak with J.D., she

specifically cautioned her not to reveal that the information had come from K.D.—a precaution that guarded against, rather than facilitated, any cross-contamination between the children's independent accounts. In addition, the Department of Human Services social worker who conducted the initial "minimal facts" interviews of the children, Cheryl Barr, testified that she interviews each child separately from any accompanying parent for the specific purpose of ensuring that the child is not influenced. Each of the three complainants [were] subsequently interviewed using the standardized forensic interview protocol employed by the PCA, conducted by trained, neutral interviewers. This pattern of independent disclosure and neutral, standardized interviewing is inconsistent with [Dooley's] theory that the complainants' accounts were the product of coordinated coaching or undue influence.

The jury heard [Dooley's] theory of bias, motive to fabricate, and undue influence in full and was properly instructed that it was the sole judge of the facts and the credibility of the witnesses. The jury was free to, and evidently did, reject [Dooley's] theory in light of the corroborating evidence described above. That the jury credited the Commonwealth's witnesses over [Dooley's] theory of fabrication is a credibility determination squarely within the jury's exclusive province, and it does not render the verdict so tenuous, vague, or uncertain as to shock the conscience of this court.

Trial Court Opinion, 7/20/26, 2-6 (citations, footnotes, and unnecessary capitalization omitted).

We cannot find any abuse of discretion in the court's decision to deny Dooley's claim that the verdict is against the weight of the evidence. As the trial court exhaustively described, the jury heard Dooley's claims that the victims were influenced by caregivers, had motives to fabricate the allegations, and testified inconsistently. The evidence was before the jury, and it was for the jury to exclusively determine the facts. Furthermore, the trial judge had the opportunity to hear and see the evidence presented, and found

that none of the claims Dooley now raises were shocking to its conscience; based on the record before us, we agree. As such, Dooley's final issue does not merit relief.

Finding all of Dooley's claims meritless, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/13/2026